The next case this morning is 522-0779, People v. Conerly. Arguing for the appellant is Byron Reyna. Arguing for the appellee is Justin Nicolosi. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today.  Good morning. Good morning, Your Honors. Mr. Is it Reyna or how do you pronounce your name, sir? Yes, Your Honor. My name is Byron Reyna. Reyna. Okay. I didn't want to mispronounce it. If there was a chance that I could, I figured I would. So Mr. Reyna, you represent the defendant, Mr. Conerly? Yes, Your Honor. Are you ready to proceed? Yes. All right. You may do so. May it please the court. Your Honors, we raised several issues in the opening brief. Today, I plan to argue the first two issues, that the evidence was insufficient to prove the prior conviction element of armed habitual criminal, and that Conerly was denied a fair trial by the improper admission and use of Officer Warren's testimony narrating a compilation surveillance video. At trial, the party stipulated that Conerly had previously been convicted of two qualifying felonies for purposes of proving AHC. However, Conerly's aggravated battery conviction in 2006 CF 384 was an invalid predicate offense. In Crosby, the First District Appellate Court reversed the defendant's AHC conviction, despite a nearly identical stipulation, where the defendant's prior conviction for aggravated battery of a police officer was an invalid predicate. Crosby found that the AHC statute requires proof the defendant had two prior convictions that qualified as either a forcible felony under Section 208, or were specifically enumerated in the AHC statute under subsections A2 or A3. Because aggravated battery of a police officer was not specifically enumerated as a forcible felony or in the AHC statute, it could not sustain conviction for AHC. Similarly here, Conerly's prior aggravated battery conviction did not qualify as a valid predicate offense. Aggravated battery is not listed in subsection 2, or excuse me, in Section 2.8 as a forcible felony, and it is not included in subsection A2 of the AHC statute and cannot qualify as an under an other offense under the residual clause of subsection A3. Here, Conerly previously pled guilty to aggravated battery and the state dismissed the charge alleging great bodily harm. Under Section 2.8, an aggravated battery conviction only constitutes a forcible felony if it is for aggravated battery with great bodily harm. By dismissing the great bodily harm count, the state took great bodily harm off the table. Are you saying that they couldn't then argue it as they did in this case? Yes, Your Honor. The statute explicitly requires two prior qualifying convictions, and the conviction here was not for aggravated battery causing great bodily harm. It was merely an aggravated battery conviction, and just as in Crosby, that does not qualify as a valid predicate under Section 2.8 or under the explicit terms of the AHC statute. But in Crosby, they conceded, the state conceded that there was no great bodily harm. Here, they're not conceding that, are they? No, Your Honor. The state is not conceding. There's no real difference between this case and Crosby, however, other than the state's decision not to concede on appeal, which essentially amounts to the state being stubborn. These convictions were not qualifying convictions, despite the prosecutor's statement during a hearing on the motion to reconsider sentence. As I discussed, the state dismissed the count involving great bodily harm, and the prosecutor's post-trial assertion didn't change the nature of the prior conviction. But, counsel, but for this stipulation, how could the state have proven the two predicate offenses, then? Well, in this case, that's the problem, Your Honor, is that they couldn't have because there weren't two qualifying predicates. I mean, if in a situation where a defendant has two prior qualifying predicate offenses, the state, absent of stipulation, could present certified copies of conviction, and the jury could see the certified copies of conviction and then make a determination about whether those offenses qualified. Here, the state could not have proven these offenses, absent this erroneous stipulation, because the aggravated battery conviction did not qualify as a prior predicate, and there were no other qualifying offenses. Okay, Mr. Reyna, we just lost you a little bit on your audio, so whatever's going on in your office, we need to make sure you stay still. Sure, I'm not, okay, I apologize, Your Honor, I'm not using a Wi-Fi network, so I should be, you know, shouldn't have any of that. I'm not a tech expert, but I shouldn't have any interruptions, so I apologize for whatever issue that was. Please let me know if you're having any troubles. I will. Hearing me. If there are no further questions on that issue, I would move on to the next issue. I will ask regarding the first issue just to reverse Mr. Connery's armed to mutual criminal convictions, or alternatively to remand for a new trial based on counsel's decision to enter into this stipulation. Regarding the second argument, in an attempt to compensate for the absence of occurrence testimony identifying Connerly as the person who possessed and fired a gun, the state presented testimony from Officer Warren, who did not see the incident, but identified Connerly as the person who discharged the firearm from a compilation surveillance video that was produced by a non-testifying third party that stitched together clips from numerous cameras to present a single narrative. The state then capitalized on the improper testimony during closing arguments, playing the video three times before encouraging the jurors to adopt Warren's testimony that the video showed Connerly possessing and firing a gun. The substantive omission of Warren's testimony violated the silent witness rule. I'm sorry, Your Honor, were you about to say something? Are you cut out there? It violated what? It violated the silent witness rule and constituted improper opinion testimony. The Illinois Supreme Court's opinions in Taylor and Smith require the foundation establishing the accuracy and reliability of the process that produced the recording. Without such foundation, there's a risk the party could manipulate the recording to its advantage. Here, there was no evidence about a number of the Taylor factors, but most critically, no testimony about how many cameras were used and recordings were used to ultimately put together the one recording shown at trial, and there's no evidence at all of what editing and production was done to come up with this video that was played. So the foundation was insufficient under Taylor and Smith. Further, Warren improperly narrated the video by providing opinions and interpretations of what it showed. In People v. Sykes, the appellate court reversed the video. In this case, though, didn't we actually have a witness that was present in the video and that also could lay a foundation to the video? Is that correct? Wasn't there actually a witness? If your honor is referring to the occurrence witness, Gabriel LaFountain, he did not identify at trial. He declined to identify Connerly from the video. He was unable to identify him at the scene as the person he saw and in court. There was no identification from the video from LaFountain, and he declined to identify Connerly in court. Officer Warren arrived at the scene after the incident occurred, so the portion of the video that he narrated, he was not present for and did not actually witness firsthand. So did he narrate the entire video or just a portion of the video, though? He narrated the entire video that showed the incident. So that portion of the video shows two people walking and allegedly the male raises his arm and the state is arguing fires a gunshot. Now that's the portion of the video the officer narrated even though he was not present and did not see that. All right. One other question. Couldn't the state have played the entire video? During, well, Your Honor, the problem here is we don't know exactly what the entire video is. This one video is a compilation of an unknown number of cameras that recorded, you know, from various angles and time this incident, and the state put an instruction into Watchtower, this company, to produce a video that showed a single narrative of the events. And I believe that whole video was essentially shown, but we don't know what was left out from all of these other recordings and camera angles. You know, there was another witness with the fountain in the car and there was no testimony from him, identification or otherwise, and no real explanation of where he went. So we just don't know where that portion of the video was or basically how the state came up with this compilation video that was played. And just as in Sykes, Warren was, oh, I'm sorry, I see I'm out of time, Your Honors. Thank you very much. You may finish answering Justice Schorler's question, if you remember what that was. She can repeat it if she likes. I believe that we were initially discussing just the entirety of the I think you answered that question. Yes, Your Honor. I did complete that answer. I was about to move on and just say that Warren's testimony added nothing that the jury themselves couldn't determine, just as in Sykes. Justice Schorler, did you have additional questions? Not at this time. Thank you. All right. Justice Moore? No questions. All right. Thank you, Mr. Reyna. Your time has expired, but we will give you some time for rebuttal after Mr. Nicolosi for the state argues, okay? Thank you, Your Honor. Mr. Nicolosi for the state, you may proceed. Thank you, Your Honor. Good morning, Your Honors. May it please the court. Mr. Reyna, my name is Justin Nicolosi. I represent the state of Illinois in this appeal. Just like Mr. Reyna, I will kind of respond to his issue one and two, as he has argued at this time. If the court has any questions on any other issue, I can answer those. Regarding issue number one, this is a defendant that stipulated to the two prior forcible felonies for proof of the armed individual criminal count. State submits that this not reverse that conviction based on that situation. Mr. Nicolosi, I'm going to stop you and I'm going to stop the clock here for a minute. I think our problem is with the appellate court, not with your, you're having the same problem that Mr. Reyna had. So I think it's on our end. So if we can't hear you, I'm going to ask for the interrupting. Mr. Nicolosi, you may proceed. No problem, Your Honors. I apologize for any issue I may be having. I am plugged into the landline internet, so there's no problems. Okay, regarding the defendant having stipulated to the prior 2006 aggravated battery conviction, the state submits that was a proper stipulation and that court could uphold that decision on counsel's part. This is not like Crosby where they merely conceded wrong. There's actually evidence in the record that supports the party stipulation in this case. I'm going to stop you there. What is the evidence that supports the stipulation? There's a document, Your Honor, found at page 102 of the common law record. It is a written stipulation form between the parties that references that stipulation was based on the facts of the case referring to the 2006 case. Is that correct? That's correct. But the parties both signed that document, which indicated that their stipulation was based on the facts of the 2006 case. Particular conviction warrants consideration as a process for purposes of the AHC. Well, let me ask you the same question I asked your opponent. But for the stipulation, how would the state have proved the two predicate offenses? I mean, Your Honor, they could have presented testimony regarding those offenses on that. Other than that, I don't, you know, get certified copies of conviction, but that's not our purposes. We need to be more in depth based on the statute requires for aggravated battery to be considered a forcible felony. You need to establish bodily harm. Mr. Raina is right on that matter. The certified copy of this particular conviction would not have shown that because this was more of a fact-specific issue. So the state would have had to present more facts by way of testimony of people involved in that particular case to establish that. Based on the stipulation, and again, we don't know what the defense counsel thought at the time. I don't remember if that was he or she. At the time, counsel made that stipulation. But the fact that they signed this document, the fact that the prosecutor, even in the motion to reconsider sentence, commented again regarding that stipulation that based on the facts of that 2006 case, that there was a stabbing in the neck and where was it? Hand, shoulder, and back. That was the person, the victim in that 2006 stab. So the prosecutor again presented that particular evidence, however slight, that 2006 case did involve harm permanent disfigurement. The state submits that there's enough in this case. Moving on. I think I did. He cut out a little bit as well. I'm having a hard time hearing. Okay. All right, Mr. Nicolosi, go ahead and proceed. I apologize again, Your Honor. It's not your fault. It's something on our end. Please don't hesitate to have me repeat. Um, uh, issue two, uh, the state submits, uh, that counsel was not ineffective regarding the surveillance footage. Um, again, I, I want to direct this court to the issue that the defendant actually posed in this case. And it was whether or not his counsel, his trial counsel was ineffective regarding this footage and regarding Warren's narration of the footage. Um, we need to look at it under the umbrella of ineffective assistance of counsel, uh, regarding the foundation for this video, the state submits that, um, that there was a proper foundation, that it is no reversible error committed was committed in this case. Um, and the fact that this, this video exists at all, as the court, the Supreme court and Taylor in 2011, I had stated is evidence that the, the system, the watchtower system was working properly. I mean, Mr. Nicolosi, really, how do we know that under people versus Taylor, you have to have somebody testify as to the workings. This, this video was not only admitted, but it was an edited version. Everybody knew it had been edited, but nobody seemed to know how it had been edited. There's no testimony on that. Well, Your Honor, because I don't think it was an issue at trial because, because officer Warren testified that the, the, the version that was shown in court, he, he was watching the live version of it because of this, he testified that watchtower streams, their surveillance cameras into the squad cars, and he was watching it at the time. He testified that the version, the events depicted, um, in the, in the courtroom were the same as the events that were depicted in the squad cars. He was watching it in real time. State would submit that that's the evidence that what was presented in court was what the cameras recorded. But he didn't arrive at the scene until after everything was over. And it, it seems, and we know that the victim couldn't or wouldn't identify the defendant at the scene. There was a show up, wasn't there? Yes, Your Honor. Yes. And there was no testimony in this case was by an officer who arrived later, who's looking at a video from a period in time. He never observed. Yeah, Your Honor. But we do have Gabriel Lafontaine did point out the defendant to the police. Um, and in the middle of the, the aftermath of the incident, because again, this case involves the defendant having fired a gun very, very close to Mr. Lafontaine. Defendant leaves. And then inexplicably, a few minutes later, he comes back to the exact same scene and Lafontaine and the person he was with, they were, they got out of the car and they, they were in the defendant went back to the apartments. They were able to point him out. And at that point, officers went over to him and discussed the matter with him. Eventually searched his apartment. We have the DNA. We have the fact that the, the, the shell casings on the ground near Lafontaine's car, Matt, uh, were fired from the gun that was found in the defendant's apartment. We have, we have strong evidence here that defendant committed this, um, uh, this crime. And that's why I directed the support of getting out of talking about this issue to the fact that this was an ineffective assistance issue, regardless of whether counsel mission or failing to object, um, aspects of the camera or the narration that we need to focus on whether or not the defendant was actually prejudiced here. Um, the state submits that the evidence in this case is very strong as the defendant with or without the video. Again, I don't think Gabriel found the defendant when he fired a gun, um, pointed him out to the investigation. This case it's admits that if it's as an issues with video and the narration, it's admits that regardless of issues, um, we need to focus on the prejudice possibly causing it. It submits the evidence. Okay. We, we can't understand you. Um, I think I got that. You don't want us to focus on the, um, deficiency of counsel, but you want us to focus on prejudice. Is that right? Sure. Your honor. Yes. I mean, if we're, if we're looking at the, the, the performance of counsel regarding, um, whether or not anybody you had mentioned your honor, whether anybody needed to testify or to lay a foundation for this video and people versus Dennis, um, the, the person who, um, operated the camera, I believe that was at a store, um, did not testify. And the court upheld the admission of that video, um, based on the fact that again, um, the fact that the video existed at all was evidence that the, the was working properly and created a video that was worth you. Well, I'm not as concerned. Well, I am concerned about the video, but, um, you said the officer could look at it in real time. And so what was admitted was a copy, but it was an edited copy. It was, yes, your honor. It was sped up and it was spliced as Mr. Raina, uh, had discussed, but, but again, edits Taylor says that edits, um, if they don't impact the reliability or the trustworthiness of the recording, and then it then reversal glare did not result to state submits that there's nothing in this case to suggest that those videos did not accurately represent what actually happened. There's no evidence. Okay. And I realize your time is run out, but with the difficulty and the question I have, we're going to run over. Um, my question to you is even if you assume that the video could be admitted, what do you have to say about the narration of the video where the officer says, that's the guy that's the defendant in this jury there? Your honor, I don't have a great argument, um, regarding that particular question. Um, what I will say is that Warren was on the scene and I believe he testified that he did have at least some vision of, you know, of the defendant. I don't know if he talked to him. The point to the record that I don't remember specifically, but Warren was on the scene. And I believe based on what he observed when he got there, he was able to testify based on what the video showed earlier, even before he got there, that the person that he observed was the person was firing the gun in front of, um, but, but he was not there in present for the entire video. And I going to butcher his name who was there was not able to testify though to, to an identify. Is that correct? That's correct. Yes. Okay. The state used the circumstantial evidence that they would obtain later to kind of put all the pieces of this case. Um, is there any other questions? I understand I'm out of time. If there are any other questions, just to show where any other questions? No, thank you. All right. Justice Moore. No questions. All right. Thank you, Mr. Nicolosi. Uh, Mr. Reina rebuttal. Thank you, your honors. Um, regarding the first issue, the state conceded that the aggravated battery conviction, um, was not a conviction for aggravated battery causing great bodily harm and that the certified copies would not have shown that either regarding the second issue, the state conceded that a Warren's testimony invaded the province of the jury. Also, I'd like to point out that while I did raise that issue, um, alternatively, that a council was ineffective for not objecting to the introduction and narration of the video. Um, we did raise that issue as plain error as well. And that this, this court can review, uh, the issue under the first prong of plain error where the evidence was close on each count. Um, just to differentiate Dennis and the case relied on the state in those cases. Um, we can be certain that basically what the officer saw when he arrived at the scene, the video is the same video that was played in court. And that's just simply not true here. Um, we know this video is edited, but we don't know the extent of what was done to it. And it, and we know it's not the same video that, um, Warren saw at the scene. Forgive me. Can you flesh out your ineffective assistance claim a little bit more for me, please? Yes. Your honor. In regard to the second issue. Yes. Both. Oh, any, any claim that you have for an effective assistant? Okay. Well, we have quite a few, um, throughout the brief. Um, it's, you know, I think council made a lot of mistakes throughout this trial. First of all, in the first issue, excuse me, excuse me, Mr. Raina, our, uh, Okay, go ahead now. Sure. Um, regarding the first issue council was ineffective for stipulating that there existed two prior convictions that qualified as predicate offenses for armed habitual criminal when there did not exist two prior convictions that could serve as valid predicates. So, uh, council then, um, failed to object and properly preserve this issue regarding the, um, surveillance video, um, allowing an officer to testify substantively about what happened on a video, even though he wasn't there and had, um, no particular knowledge that the jury didn't have and couldn't determine for themselves. The juror saw Connerly in court, they saw photographs of the guns in question and were perfectly capable of determining whether the video showed Connerly and the alleged gun. Um, council also failed to object to, um, a witness's testimony insinuating that, um, Mr. Connerly's use of the word girlfriends on a jail phone call referenced, um, guns and the prosecutor then, um, heightened the additional, uh, failed to object. No, I'm sorry. Council to remove portions of this phone call that discussed in a prior, I believe is domestic battery conviction, um, that otherwise would not have come into evidence. And this is, you know, other crimes. Evidence is inherently prejudicial. Council was alerted that the video contained this prejudicial evidence. And so you didn't want to challenge it. Just let it in. Um, so it is entirely unhelpful. Uh, and, uh, we believe that's the extent of the ineffective assistance arguments. Um, there was a board here issue as well. Excuse me. I'm sorry, Your Honor. What about the prejudice prong? You've, you've described the deficiencies in council. And so you've shown that there's a plain, you've shown potentially there's an error under the plain error prong. What about the second prong of the plain error? Well, the first prong of plain error, uh, allows review. If the evidence is close, regardless of the strength of the evidence, but ineffective assistance requires a showing of prejudice. And here there's plenty of prejudice from council's deficiencies. First with the AHC claim, um, the state would not have been able to prove this offense if council had simply not stipulated. Um, that's extremely prejudicial. Um, he did not force the state to meet its burden of proof on a critical element of the offense regarding the testimony. Absent Warren's testimony, there is no identification evidence. There's no occurrence witness who, even though there were two witnesses, um, two people present at the time of this alleged incident, there was no witness who was going to come into court and identify Connerly as that person who supposedly fired the gun. Well, the first officer, the first officer that arrested the defendant did so based on Mr. LaFontaine pointing him out, didn't he? Yes, he pointed him out as someone at the scene though. Um, and the state actually quoted the officer's language about what, um, LaFontaine said when he pointed him out and it, it's, he did not point him out as the shooter or person involved and specifically declined to identify him during the show up. Um, his statement during the point out, it doesn't really make sense. He just, uh, basically pointed him out as somebody who was there. Um, we already know he was at the scene. So that's, uh, that is not, um, you know, that didn't add anything to the state's case. So, um, the prejudice prong though for counsel's failure to object to the admission of Warren's testimony is that he allowed the jury to hear identification evidence from a witness who didn't see the incident when there was no other, um, available identification from witnesses who did see the the, uh, ineffectiveness was prejudicial for failing to keep the prior domestic battery conviction out because it gave the jury the impression that Mr. Connerly was a bad person deserving of punishment as other crimes evidence, you know, inherently does. Um, and his failure to, um, object to the use of the prosecutor's use of the word, um, I'm sorry, the witnesses use of the word girlfriends equaling guns. And then the prosecutors emphasizing that during closing, um, was prejudicial because allowed the state to argue facts that weren't in evidence and were speculative. I see I'm out of time. Okay, you are Mr. Rain and we appreciate your arguments. Mr. Nicolosi, we appreciate your arguments. Uh, this matter involving Mr. Connerly will be taken under advisement and we will issue an order in due course.